SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| DW PROPERTIES, a Belgian private limited company,<br><br>                          *Plaintiff*,<br><br>             v.<br><br>LIVE ART INC., a Delaware corporation a/k/a LIVE ART MARKET, INC., a Delaware corporation,<br><br>                          *Defendant*. | Index No. 155808/2023<br><br>**AMENDED SUMMONS** |

**TO THE ABOVE NAMED DEFENDANT(S):**

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within twenty (20) days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

        The basis for venue is CPLR § 501.

Dated: New York, New York
       July 10, 2023

                                                                       **FOSTER GARVEY, P.C.**

                                                                       By: ___/s/ Yeli Zhou_____
                                                                           Alan A. Heller, Esq.
                                                                           Yeli Zhou, Esq.
                                                                           100 Wall Street, 20th Floor
                                                                           New York, New York 10005
                                                                           (212) 965-4526
                                                                           alan.heller@foster.com
                                                                           yeli.zhou@foster.com
                                                                           *Attorneys for Plaintiff*

To:    Live Art Inc.
         a/k/a Live Art Market , Inc.
         251 Little Falls Drive,
         Wilmington, New Castle, DE 19808

         24A Trolley Square #2133,
         Wilmington, Delaware

FG: 101678854.2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| DW PROPERTIES, a Belgian private limited company,<br><br>                        *Plaintiff*,<br><br>    v.<br><br>LIVE ART INC., a Delaware corporation a/k/a LIVE ART MARKET, INC., a Delaware corporation,<br><br>                        *Defendant*. | Index No. 155808/2023<br><br>**AMENDED COMPLAINT** |

Plaintiff, DW Properties, by their attorneys, Foster Garvey PC, as and for their Complaint against Live Art Inc., a/k/a Live Art Market, Inc., alleges as follows:

## INTRODUCTION

1.    This is an action to recover contractual damages arising from Defendant's breach of express warranty as written in the Terms and Conditions of Sale of Invoice of Cornelius Annor's painting "ya tena ase" and tortious damages arising from Defendant's misrepresentation that good title of "ya tena ase" would pass to Plaintiff upon purchase of the painting. Pursuant to the fee-shifting provision of the Terms and Conditions of Sale of Invoice, Plaintiff also seeks to recover reasonable attorneys' fees and costs for prosecuting this action.

## JURISDICTION AND VENUE

2.    Jurisdiction and venue are proper because the Parties consented to the exclusive jurisdiction of the state courts sitting in the New York State and County of New York in the Terms and Conditions of Sale of Invoice.

## PARTIES

3.    Plaintiff DW Properties ("DW Properties") is a Belgian private limited company located at 43 Drève Pittoresque, 1180 Uccle, Belgium.

-1-

FG: 101596546.2

-2-

4. Defendant Live Art Inc., a/k/a Live Art Market, Inc. ("Live Art"), is a Delaware corporation with its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, Delaware 19808.

## RELEVANT NON-PARTY INDIVIDUALS

5. Sacha Daskal is a Belgian citizen who is the Principal of DW Properties.

6. George O'Dell was the Executive Vice President of Live Art. Mr. O'Dell joined Live Art in May 2021 and left the company in or around April 2023.

7. Jeremy Larner is the owner of an art studio who sold Cornelius Annor's painting "ya tena ase" to Live Art with a resale restriction.

## FACTUAL ALLEGATIONS

### Live Art's Expertise in the Art World

8. Live Art is a global art trading platform for all forms of art, all types of creators and every kind of collector. It streamlines the discovery, sales and distribution of art with the goal of delivering exclusive collecting experiences to a global audience.

9. According to its official website, Live Art is "a global peer-to-peer trading platform that is powered by unprecedented transparency of art market data and analytics" and it has a "network of artists, galleries and collectors" who interact to buy and sell fine art. Live Art claims that its analytics, which provides market data and intelligence for the art market, is used by over 100,000 art collectors worldwide.

10. George O'Dell held the position as Live Art's Executive Vice President from May 2021 to April 2023. He is also Sacha Daskal's longtime advisor and contact in the art world when it comes to Mr. Daskal's own collection.

11. Mr. O'Dell is a reputable and well-respected contemporary art expert who helps his clients build bespoke collections rich with personality and taste. He has extensive experience in the sales of fine art as well as collection and collector management, and he frequently guided and educated collectors to get to know contemporary art by having open and real conversations with them regarding the best sales channel.

12. According to an article published by international auction house Sotheby's, Mr. O'Dell completed Sotheby's Institute masters program after graduating from college and started his career with another reputable auction house Phillips as their Head of Day Sales. In 2013, he joined Sotheby's in London as the Head of Day Sale for the Contemporary Art department. Mr. O'Dell came to New York in 2019 and led Sotheby's contemporary private sales department before he joined Live Art in May 2021 as the Executive Vice President.

**Live Art's Representation of Cornelius Annor's Painting "ya tena ase" to Sacha Daskal**

13. Sacha Daskal is the Principal of DW Properties.

14. Mr. Daskal is a collector who is interested in contemporary art, and he sometimes purchases artwork in the customary manner from art galleries.

15. Mr. Daskal has not received any education related to art, nor does he have any expertise in the art market regarding contemporary art's collection or sales.

16. Because of Live Art's sophistication and extensive knowledge in the art world, it became Mr. Daskal's trusted advisor when it comes to his own collection of contemporary art. Mr. Daskal purchased approximately fifteen pieces of artworks from Live Art. For each piece that Mr. Daskal purchased, Live Art would first look into the market and find him artworks or artists that are compatible with his personality and taste; then, Live Art would recommend him to purchase certain piece because not only could he enjoy the artwork, it would also be a good

investment that could yield good return for him if he decides to sell it at some point in the future.

17. On November 12, 2021, Live Art, through Mr. O'Dell, informed Mr. Daskal of the opportunity to purchase Cornelius Annor's painting "ya tena ase." Mr. O'Dell proposed three pieces of artworks to Mr. Daskal that day, including "ya tena ase," telling him that among these three artworks, "ya tena ase" was the most expensive one and had the most upside potential for profit in the event of a resale.

18. Additionally, Mr. O'Dell also told Mr. Daskal that Live Art bought "ya tena ase" straight from another art studio for around $25,000. He also informed Mr. Daskal that the artist Cornelius Annor was very good.

19. Before Mr. Daskal made the decision to purchase "ya tena ase," Mr. Daskal told Live Art that he intended to own and enjoy the painting for a limited period of time and then he would like to resale it on the market at some point.

20. Due to the idea of potential resale of "ya tena ase" in Mr. Daskal's mind at the time he considered purchasing this painting from Live Art, Mr. Daskal carefully counseled Live Art about the marketability of this particular painting. Specifically, Mr. Daskal asked Live Art a series questions, including but not limited to, the marketing potential of "ya tena ase" and Cornelius Annor's artwork in general, the estimated sales price of "ya tena ase" that could be achieved through auctions, and the best timing of resale of "ya tena ase."

21. In response, Live Art told Mr. Daskal that the painting would worth his investment because he could probably sell it on the market for $120,000.

22. In no time during these conversations did Live Art mention anything to Mr. Daskal about the material fact that there was actually a resale restriction placed on "ya tena ase" so that Mr. Daskal would not be able to resale this painting on the market.

23. Instead, Live Art represented to Mr. Daskal that it would deliver good title of "ya tena ase" without any resale restriction upon Mr. Daskal's payment of purchase price of this painting.

24. Live Art memorialized this representation into the written Terms and Conditions of Sale of Invoice. Specifically, the second paragraph of Terms and Conditions of Sale of Invoice stated that "Seller warrants good title to the Work shall pass upon payment of the Purchase Price and that the Work was created by the artist … The benefits of the representations and warranties in this Invoice survive the completion of the sale and inure to the benefit of Buyer, but not to subsequent owners or others who may acquire an interest in the Work."

25. Mr. Daskal, as a customary collector who does not have any special knowledge in contemporary art and does not have any obligation to conduct due diligence to verify Live Art's representations and warranties, reasonably relied on Live Art's sophistication and expertise in the art industry as well as its due diligence effort of each piece of art that it recommended Mr. Daskal to purchase including "ya tena ase"; and since Live Art has made express warranty about the good title of "ya tena ase," there was no reason for Mr. Daskal to doubt the truthfulness of such representation.

26. Live Art possessed unique knowledge of how it acquired "ya tena ase" in the first place as well as whether it could deliver good title to Mr. Daskal, but Live Art misrepresented such fact and warranted good title to Mr. Daskal when it knew that such representation was false.

27. In comparison of Live Art's position, Mr. Daskal, on the other hand, did not have any knowledge in terms of how Live Art acquired "ya tena ase," nor could Mr. Daskal have possibly found out that there was actually a resale restriction placed on this painting.

-5-

28. In light of Live Art's promise that it would deliver good title of "ya tena ase," Mr. Daskal, acting as the Principal of DW Properties, purchased the painting on November 18, 2021 for $80,000, including $5,000 commission for Live Art. Mr. Daskal also paid expenses in association with this painting, including crating, packing, shipping, in the amount of $292.50.

**The Resale Restriction of Cornelius Annor's Painting "ya tena ase"**

29. After Mr. Daskal purchased "ya tena ase," he and Live Art kept having conversations. On May 21, 2022, Mr. Daskal told Live Art that he was thinking about selling a few pieces of art in his collection, including "ya tena ase," and he asked Mr. O'Dell whether he could sell "ya tena ase" right away or he should wait a bit more. Mr. O'Dell told Mr. Daskal that he should wait a bit longer to resale this painting.

30. Thereafter, on December 2, 2022, Mr. Daskal asked Live Art again about whether it was a good time to sell "ya tena ase," and Mr. O'Dell responded by saying that he had an offer from someone who was looking to buy. However, the offer did not eventually come through.

31. Then, on February 13, 2023, when Mr. Daskal inquired about the resale of three pieces of art in his collection including "ya tena ase," Mr. O'Dell recommended that auction house Phillips would be a sensible route and he suggested giving all three pieces of art as a package to Phillips for auction.

32. Mr. Daskal then addressed his concern that he worried he might lose 50% on "ya tena ase" at auction, but Live Art assured him that he would be able to break even or profit above the $80,000 purchase price. Mr. Daskal trusted Live Art's advice, so he agreed to proceed with auction at Phillips.

33. Afterwards, on April 14, 2023, Live Art informed Mr. Daskal that someone at Phillips told Jeremy Larner, the owner of the art studio who sold "ya tena ase" to Live Art, that

"ya tena ase" was coming up to sale and Mr. Larner was trying to stop this piece from being offered at auction due to the resale restriction. Live Art then asked Mr. Daskal if he could ask the Principal Auctioneer at Phillips to tell Mr. Larner to back off.

34. Not understanding what Live Art meant, Mr. Daskal prepared to proceed with a Seller's Auction Agreement with Phillips to sell "ya tena ase" anyway until Phillips's Principal Auctioneer reached out to him on April 20, 2023, telling him that a third-party art studio had informed Phillips that they sold "ya tena ase" to Live Art with a valid and enforceable resale restriction in the United States and Live Art violated such resale restriction by selling this painting to DW Properties.

35. The Principal Auctioneer further stated that due to this valid and enforceable resale restriction, the art studio might take legal action, such as an injunction, against Phillips and DW Properties to prevent "ya tena ase" from being included in the auction sale.

36. Based on Phillips' reasonable belief that the auction of "ya tena ase" would subject it to a legal claim, Phillips exercised its right under the Seller's Auction Agreement to withdraw the painting from the auction.

37. When Phillips' Principal Auctioneer reached out to Mr. Daskal regarding the resale restriction, it was the first time that Mr. Daskal learned about this information. Had Live Art conveyed this fact to Mr. Daskal truthfully without misrepresentation, Mr. Daskal would not have bought the painting in the first place.

38. As a result of Live Art's breach of express warranty and tortious misrepresentation, Mr. Daskal suffered damages in an amount that needs to be proven at trial but in any event no less than $80,292.50.

39. Pursuant to the Terms and Conditions of Sale of Invoice, "[t]he prevailing party shall in any dispute shall be entitled to its costs, including its reasonable attorneys' fees." Accordingly, in addition to the monetary damages, DW Properties also seeks to recover reasonable attorneys' fees and costs for prosecuting this action.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

40. Plaintiff repeats and realleges paragraphs 1 through 39 as if fully alleged herein.

41. On November 18, 2021, DW Properties and Live Art entered into a Terms and Conditions of Sale of Invoice.

42. DW Properties performed on the contract by paying $80,000 to Live Art.

43. Live Art breached the contract by its failure to deliver good title of "ya tena ase" to DW Properties.

44. As a result of Live Art's breach, DW Properties suffered damages of at least $80,292.50.

**SECOND CAUSE OF ACTION**
**(Breach of Warranty)**

45. Plaintiff repeats and realleges paragraphs 1 through 44 as if fully alleged herein.

46. Live Art made a material statement amounting to an express warranty in the Terms and Conditions of Sale of Invoice that Live Art would deliver good title of "ya tena ase" to DW Properties upon payment of the purchase price of $80,000.

47. DW Properties relied on this express warranty as a basis for the Terms and Conditions of Sale of Invoice.

48. Live Art breached the express warranty because "ya tena ase" does not have good title due to a valid and enforceable resale restriction in the United States.

49. As a result of Live Art's breach of express warranty, DW Properties suffered damages of at least $80,292.50.

### THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Duty of Good Faith and Fair Dealing)

50. Plaintiff repeats and realleges paragraphs 1 through 49 as if fully alleged herein.

51. Every contract or duty within the New York Uniform Commercial Code relating to the sale of goods imposes an obligation of good faith in its performance or enforcement. The Terms and Conditions of Sale of Invoice the Parties entered into is a contract relating to the sale of goods, therefore Live Art owes DW Properties such implied duty.

52. Live Art breached the implied covenant of duty of good faith and fair dealing by misrepresenting that "ya tena ase" has good title when in fact it does not because of a resale restriction in the United States.

53. Live Art's misrepresentation deprived DW Properties from receiving the anticipated fruits from the contract that it bargained for.

54. As a result of DW Properties' breach of its implied obligation of good faith and fair dealing, DW Properties suffered damages of at least $80,292.50.

### FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

55. Plaintiff repeats and realleges paragraphs 1 through 54 as if fully alleged herein.

56. Live Art is a reputable and well-respected art gallery that possesses unique and specialized expertise in contemporary art. Due to its sophistication and extensive knowledge in the art industry, Live Art was in a special position of confidence and trust with Mr. Daskal, who has no special knowledge in contemporary art, to render him advice related to those art pieces that Live Art recommended Mr. Daskal to purchase.

57. Because of this special relationship of confidence and trust between Live Art and Mr. Daskal, Live Art owes Mr. Daskal a duty to impart correct information in terms of whether "ya tena ase" has good title.

58. Live Art mispresented that "ya tena ase" has good title when it knew or should have known that "ya tena ase" does not have good title because of a resale restriction in the United States.

59. Live Art knew that the information in terms of whether "ya tena ase" has good title was desired by Mr. Daskal, since Mr. Daskal told Mr. O'Dell that he intended to own and enjoy the painting for a limited period of time and then he would like to resale it on the market.

60. Mr. Daskal reasonably relied on Live Art's false representation and bought "ya tena ase" from Live Art.

61. As a result of Live Art's misrepresentation, Mr. Daskal suffered damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant for damages in an amount to be proven at trial but in any event no less than $80,292.50, with interest thereon. Plaintiff also respectfully requests an award of reasonable attorneys' fees and costs for prosecuting this action, given that the Terms and Conditions of Sale of Invoice expressly provided that the prevailing party in any dispute shall be entitled to such award.

Dated: New York, New York
July 10, 2023

Respectfully submitted,

**FOSTER GARVEY P.C.**

By: *Yeli Zhou* _____
Alan A. Heller, Esq.
Yeli Zhou, Esq.
100 Wall Street, 20th Floor
New York, New York 10005-3708
(212) 431-8700
alan.heller@foster.com
yeli.zhou@foster.com

*Attorneys for Plaintiff*