UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DW PROPERTIES, a Belgian private limited company, | Case No. 23-cv-7004 (JPO) |
| *Plaintiff*, | **AMENDED COMPLAINT** |
| -against- | |
| LIVE ART MARKET, INC., a Delaware corporation, | |
| *Defendant*. | |

Plaintiff, DW Properties, by their attorneys, Foster Garvey PC, as and for their Amended Complaint against Live Art Market, Inc., alleges as follows:

## INTRODUCTION

1. This is an action to recover contractual damages arising from Defendant's breach of express warranty as written in the Terms and Conditions of Sale of Invoice of Cornelius Annor's painting "ya tena ase" and tortious damages arising from Defendant's misrepresentation that good title of "ya tena ase" would pass to Plaintiff upon purchase of the painting. Pursuant to the fee-shifting provision of the Terms and Conditions of Sale of Invoice, Plaintiff also seeks to recover reasonable attorneys' fees and costs for prosecuting this action. Plaintiff also seeks to recover interest thereon from November 18, 2021, the date of the Sale of Invoice.

## JURISDICTION AND VENUE

2. Jurisdiction and venue are proper because the Parties consented to "the exclusive jurisdiction of the state courts of, and the federal courts sitting in, the State and County of New York" in the Terms and Conditions of Sale of Invoice.

3. Jurisdiction and venue are also proper based on diversity of citizenship under 28 U.S.C. § 1332(a)(2), given that DW Properties is a Belgian private limited company and Live Art

Market, Inc. is a Delaware corporation, and the amount in controversy exceeds the threshold of $75,000.

## PARTIES

4. Plaintiff DW Properties ("DW Properties") is a Belgian private limited company located at 43 Drève Pittoresque, 1180 Uccle, Belgium.

5. Defendant Live Art Market, Inc. ("Live Art Market"), is a Delaware corporation with its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, Delaware 19808.

## RELEVANT NON-PARTY INDIVIDUALS

6. Sacha Daskal is a Belgian citizen who is the Principal of DW Properties.

7. George O'Dell was the Executive Vice President of Live Art Market. Mr. O'Dell joined Live Art Market in May 2021 and left the company in or around April 2023.

8. Jeremy Larner is the owner of an art studio who sold Cornelius Annor's painting "ya tena ase" to Live Art Market with a resale restriction.

## FACTUAL ALLEGATIONS

### Live Art Market's Expertise in the Art World

9. Live Art Market is a global art trading platform for all forms of art, all types of creators and every kind of collector. It streamlines the discovery, sales and distribution of art with the goal of delivering exclusive collecting experiences to a global audience.

10. According to its official website, Live Art Market is "a global peer-to-peer trading platform that is powered by unprecedented transparency of art market data and analytics" and it has a "network of artists, galleries and collectors" who interact to buy and sell fine art. Live Art Market claims that its analytics, which provides market data and intelligence for the art market, is

used by over 100,000 art collectors worldwide.

11.     George O'Dell held the position as Live Art Market's Executive Vice President from May 2021 to April 2023.  He is also Sacha Daskal's longtime advisor and contact in the art world when it comes to Mr. Daskal's own collection.

12.     Mr. O'Dell is a reputable and well-respected contemporary art expert who helps his clients build bespoke collections rich with personality and taste.  He has extensive experience in the sales of fine art as well as collection and collector management, and he frequently guided and educated collectors to get to know contemporary art by having open and real conversations with them regarding the best sales channel.

13.     According to an article published by international auction house Sotheby's, Mr. O'Dell completed Sotheby's Institute masters program after graduating from college and started his career with another reputable auction house Phillips as their Head of Day Sales.  In 2013, he joined Sotheby's in London as the Head of Day Sale for the Contemporary Art department.  Mr. O'Dell came to New York in 2019 and led Sotheby's contemporary private sales department before he joined Live Art Market in May 2021 as the Executive Vice President.

## Live Art Market's Representation of Cornelius Annor's Painting "ya tena ase" to Sacha Daskal

14.     Sacha Daskal is the Principal of DW Properties.

15.     Mr. Daskal is a collector who is interested in contemporary art, and he sometimes purchases artwork in the customary manner from art galleries.

16.     Mr. Daskal has not received any education related to art, nor does he have any expertise in the art market regarding contemporary art's collection or sales.

17.     Because of Live Art Market's sophistication and extensive knowledge in the art world, it became Mr. Daskal's trusted advisor when it comes to his own collection of contemporary

FG: 101891489.1

art. Mr. Daskal purchased approximately fifteen pieces of artworks from Live Art Market. For each piece that Mr. Daskal purchased, Live Art Market would first look into the market and find him artworks or artists that are compatible with his personality and taste; then, Live Art Market would recommend him to purchase certain piece because not only could he enjoy the artwork, it would also be a good investment that could yield good return for him if he decides to sell it at some point in the future.

18. On November 12, 2021, Live Art Market, through Mr. O'Dell, informed Mr. Daskal of the opportunity to purchase Cornelius Annor's painting "ya tena ase." Mr. O'Dell proposed three pieces of artworks to Mr. Daskal that day, including "ya tena ase," telling him that among these three artworks, "ya tena ase" was the most expensive one and had the most upside potential for profit in the event of a resale.

19. Additionally, Mr. O'Dell also told Mr. Daskal that Live Art Market bought "ya tena ase" straight from another art studio for around $25,000. He also informed Mr. Daskal that the artist Cornelius Annor was very good.

20. Before Mr. Daskal made the decision to purchase "ya tena ase," Mr. Daskal told Live Art Market that he intended to own and enjoy the painting for a limited period of time and then he would like to resale it on the market at some point.

21. Due to the idea of potential resale of "ya tena ase" in Mr. Daskal's mind at the time he considered purchasing this painting from Live Art Market, Mr. Daskal carefully counseled Live Art Market about the marketability of this particular painting. Specifically, Mr. Daskal asked Live Art Market a series of questions over constant text messages and correspondence,[1] including but

---

[1] Mr. Daskal is a Belgium citizen, and he resides in Brussels. For this reason, conversations between Mr. Daskal and Live Art Market primarily occurred through WhatsApp messages and phone calls, as opposed to in-person meetings.

not limited to, the marketing potential of "ya tena ase" and Cornelius Annor's artwork in general, the estimated sales price of "ya tena ase" that could be achieved through auctions, and the best timing of resale of "ya tena ase."

22. In response, Live Art Market told Mr. Daskal that the painting would be worth his investment because he could probably sell it on the market for $120,000.

23. Live Art Market continuously attempted to communicate directly with Mr. Daskal to induce him to purchase the painting through WhatsApp messages and phone calls. In no time during these conversations did Live Art Market mention anything to Mr. Daskal about the material fact that there was actually a resale restriction placed on "ya tena ase" so that Mr. Daskal would not be able to resale this painting on the market.

24. Instead, Live Art Market represented to Mr. Daskal that it would deliver good title of "ya tena ase" without any resale restriction upon Mr. Daskal's payment of purchase price of this painting.

25. Live Art Market memorialized this representation into the written Terms and Conditions of Sale of Invoice. Specifically, the second paragraph of Terms and Conditions of Sale of Invoice stated that "Seller warrants good title to the Work shall pass upon payment of the Purchase Price and that the Work was created by the artist … The benefits of the representations and warranties in this Invoice survive the completion of the sale and inure to the benefit of Buyer, but not to subsequent owners or others who may acquire an interest in the Work."

26. Mr. Daskal, as a customary collector who does not have any special knowledge in contemporary art and does not have any obligation to conduct due diligence to verify Live Art Market's representations and warranties, reasonably trusted and relied on Live Art Market's sophistication and expertise in the art industry, its due diligence effort of each piece of art that it

recommended Mr. Daskal to purchase including "ya tena ase," and its continued attempt to contact Mr. Daskal directly with the promise that Mr. Daskal would make good investment by purchasing "ya tena ase" from Live Art Market because he could sell this painting on the market with a much higher price afterwards.

27. Since Live Art Market has made express warranty about the good title of "ya tena ase," there was no reason for Mr. Daskal to doubt the truthfulness of such representation.

28. Live Art Market possessed unique knowledge of how it acquired "ya tena ase" in the first place as well as whether it could deliver good title to Mr. Daskal, but Live Art Market misrepresented such fact and warranted good title to Mr. Daskal when it knew that such representation was false.

29. In comparison of Live Art Market's position, Mr. Daskal, on the other hand, did not have any knowledge in terms of how Live Art Market acquired "ya tena ase," nor could Mr. Daskal have possibly found out that there was actually a resale restriction placed on this painting.

30. In light of Live Art Market's promise that it would deliver good title of "ya tena ase," Mr. Daskal, acting as the Principal of DW Properties, purchased the painting on November 18, 2021 for $80,000, including $5,000 commission for Live Art Market. Attached as **Exhibit A** is a true and correct copy of Sale of Invoice of Cornelius Annor's painting "ya tena ase." Mr. Daskal also paid expenses in association with this painting, including crating, packing, shipping, in the amount of $292.50.

**The Resale Restriction of Cornelius Annor's Painting "Ya Tena Ase"**

31. After Mr. Daskal purchased "ya tena ase," he and Live Art Market kept having conversations. On May 21, 2022, Mr. Daskal told Live Art Market that he was thinking about selling a few pieces of art in his collection, including "ya tena ase," and he asked Mr. O'Dell

-6-
FG: 101891489.1

whether he could sell "ya tena ase" right away or he should wait a bit more. Mr. O'Dell told Mr. Daskal that he should wait a bit longer to resale this painting.

32. Thereafter, on December 2, 2022, Mr. Daskal asked Live Art Market again about whether it was a good time to sell "ya tena ase," and Mr. O'Dell responded by saying that he had an offer from someone who was looking to buy. However, the offer did not eventually come through.

33. Then, on February 13, 2023, when Mr. Daskal inquired about the resale of three pieces of art in his collection including "ya tena ase," Mr. O'Dell recommended that auction house Phillips would be a sensible route and he suggested giving all three pieces of art as a package to Phillips for auction.

34. Mr. Daskal then addressed his concern that he worried he might lose 50% on "ya tena ase" at auction, but Live Art Market assured him that he would be able to break even or profit above the $80,000 purchase price. Mr. Daskal trusted Live Art Market's advice, so he agreed to proceed with auction at Phillips.

35. Afterwards, on April 14, 2023, Live Art Market informed Mr. Daskal that someone at Phillips told Jeremy Larner, the owner of the art studio who sold "ya tena ase" to Live Art Market, that "ya tena ase" was coming up to sale and Mr. Larner was trying to stop this piece from being offered at auction due to the resale restriction. Live Art Market then asked Mr. Daskal if he could ask the Principal Auctioneer at Phillips to tell Mr. Larner to back off.

36. Not understanding what Live Art Market meant, Mr. Daskal prepared to proceed with a Seller's Auction Agreement with Phillips to sell "ya tena ase" anyway until Phillips's Principal Auctioneer reached out to him on April 20, 2023, telling him that a third-party art studio had informed Phillips that they sold "ya tena ase" to Live Art Market with a valid and enforceable

resale restriction in the United States and Live Art Market violated such resale restriction by selling this painting to DW Properties.

37. The Principal Auctioneer further stated that due to this valid and enforceable resale restriction, the art studio might take legal action, such as an injunction, against Phillips and DW Properties to prevent "ya tena ase" from being included in the auction sale.

38. Based on Phillips' reasonable belief that the auction of "ya tena ase" would subject it to a legal claim, Phillips exercised its right under the Seller's Auction Agreement to withdraw the painting from the auction.

39. When Phillips' Principal Auctioneer reached out to Mr. Daskal regarding the resale restriction, it was the first time that Mr. Daskal learned about this information. Had Live Art Market conveyed this fact to Mr. Daskal truthfully without misrepresentation, Mr. Daskal would not have bought the painting in the first place.

**Documents Produced by Phillips Confirm the Enforceability of
the Resale Restriction and Live Art Market's Knowledge of Such
Resale Restriction Before Selling "Ya Tena Ase" to Mr. Daskal**

40. On July 7, 2023, DW Properties subpoenaed Phillips by a Non-Party Subpoena Duces Tecum.[2] Among several document requests DW Properties listed in the Subpoena Duces Tecum, Phillips was requested to produce any and all documents concerning the resale restriction of "ya tena ase."

41. Phillips made the document production to DW Properties on July 26, 2023. The document production contains a contract between Live Art Market and GOOD LAMP (a company owned by Jeremy Larner) dated November 12, 2021, and the contract clearly provides, "[Live Art Market] agrees it will not, under any circumstances offer [Ya Tena Ase] through an art fair or

---

[2] The Non-Party Subpoena Duces Tecum was served on Phillips on July 7, 2023, and a copy of which was sent to Live Art Market's counsel via email on July 11, 2023.

public auction for a three (3) year period (the "Non-Resale Period") starting from the date of this invoice. [Ya Tena Ase] is also sold on condition that, during the Non-Resale Period, [Live Art Market] will not offer [Ya Tena Ase] for a private sale to a third party other than by offering GOOD LAMP a first right of refusal to carry out this sale." Attached as **Exhibit B** is a true and correct copy of the sales contract between Live Art Market and GOOD LAMP.

42. The document production by Phillips also contains an email correspondence between Jeremy Larner and Phillips' auction team dated April 13, 2023, in which Mr. Larner told Phillips, "It has come to my attention that somebody is attempting to cosign the work in the attached invoice to Phillips. Please be advised this work is restricted from going to auction until November 13, 2024, and that it is also subject to a right of first refusal which has not been given to my company Good Lamp. Many thanks for not accepting this consignment, as it is only going to cause damages and headaches for all." Attached as **Exhibit C** is a true and correct copy of an email correspondence between Jeremy Larner and Phillips' auction team dated April 13, 2023.

43. Based on these documents produced by Phillips, it is apparent that Live Art Market knew about the resale restriction on "ya tena ase" before selling this painting to DW Properties. And yet, Live Art Market induced Mr. Daskal into purchasing the painting by making the false representation that good and marketable title would pass to DW Properties upon his payment of the purchase price.

44. More incredibly, Mr. Larner's company Good Lamp was not offered a first right of refusal before Live Art Market sold "ya tena ase" to DW Properties. Therefore, not only is DW Properties restricted from selling the painting until November 13, 2024, but it also has not received rightful title of "ya tena ase," since the passing of such title from Live Art Market to DW Properties is conditioned upon Good Lamp receiving the first right of refusal, a condition that Live Art Market

utterly failed to carry out.

## DW Properties Is Entitled to Relief
## and Recovery of Reasonable Attorneys' Fees, Costs and Interests

45. DW Properties was induced to purchase "ya tena ase" due to Live Art Market's tortious misrepresentation. Had Mr. Daskal knew about the three-year resale restriction and Live Art Market's failure to ask Good Lamp for its first right of refusal before selling the painting to DW Properties, DW Properties would not have bought the painting in the first place.

46. As a result of Live Art Market breach of express warranty and tortious misrepresentation, Live Art Marekt is entitled to relief.

47. Pursuant to the Terms and Conditions of Sale of Invoice, "[t]he prevailing party shall in any dispute shall be entitled to its costs, including its reasonable attorneys' fees." *See* **Exhibit A**. Accordingly, in addition to the monetary damages, DW Properties also seeks to recover reasonable attorneys' fees and costs for prosecuting this action against Live Art Market.

48. DW Properties also seeks to recover interest thereon from November 18, 2021 to date.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

49. Plaintiff repeats and realleges paragraphs 1 through 48 as if fully alleged herein.

50. On November 18, 2021, DW Properties and Live Art Market entered into a Terms and Conditions of Sale of Invoice.

51. DW Properties performed on the contract by paying $80,000 to Live Art Market.

52. Live Art Market breached the contract by its failure to deliver good title of "ya tena ase" to DW Properties.

FG: 101891489.1

53. As a result of Live Art Market's breach, DW Properties suffered damages of at least $80,292.50.

## SECOND CAUSE OF ACTION
### (Breach of Warranty)

54. Plaintiff repeats and realleges paragraphs 1 through 53 as if fully alleged herein.

55. Live Art Market made a material statement amounting to an express warranty in the Terms and Conditions of Sale of Invoice that Live Art Market would deliver good title of "ya tena ase" to DW Properties upon payment of the purchase price of $80,000.

56. DW Properties relied on this express warranty as a basis for the Terms and Conditions of Sale of Invoice.

57. Live Art Market breached the express warranty because "ya tena ase" does not have good title due to a valid and enforceable resale restriction in the United States.

58. As a result of Live Art Market's breach of express warranty, DW Properties suffered damages of at least $80,292.50.

## THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Duty of Good Faith and Fair Dealing)

59. Plaintiff repeats and realleges paragraphs 1 through 58 as if fully alleged herein.

60. Every contract or duty within the New York Uniform Commercial Code relating to the sale of goods imposes an obligation of good faith in its performance or enforcement. The Terms and Conditions of Sale of Invoice the Parties entered into is a contract relating to the sale of goods, therefore Live Art Market owes DW Properties such implied duty.

61. Live Art Market breached the implied covenant of duty of good faith and fair dealing by misrepresenting that "ya tena ase" has good title when in fact it does not because of a resale restriction in the United States.

62. Live Art Market's misrepresentation deprived DW Properties from receiving the anticipated fruits from the contract that it bargained for.

63. As a result of DW Properties' breach of its implied obligation of good faith and fair dealing, DW Properties suffered damages of at least $80,292.50.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

64. Plaintiff repeats and realleges paragraphs 1 through 63 as if fully alleged herein.

65. Live Art Market is a reputable and well-respected art gallery that possesses unique and specialized expertise in contemporary art. Due to its sophistication and extensive knowledge in the art industry, Live Art Market was in a special position of confidence and trust with Mr. Daskal, who has no special knowledge in contemporary art, to render him advice related to those art pieces that Live Art Market recommended Mr. Daskal to purchase.

66. Because of this special relationship of confidence and trust between Live Art Market and Mr. Daskal, Live Art Market owes Mr. Daskal a duty to impart correct information in terms of whether "ya tena ase" has good title.

67. Live Art Market mispresented that "ya tena ase" has good title when it knew or should have known that "ya tena ase" does not have good title because of a resale restriction in the United States.

68. Further, Live Art Market mispresented that "ya tena ase" has good title when it knew or should have known that it failed to offer Jeremy Larner's company Good Lamp a first right of refusal before selling the painting to DW Properties, which is a condition that must be carried out by Live Art Market in order to deliver good title of "ya tena ase" to DW Properties.

69. Live Art Market knew that the information in terms of whether "ya tena ase" has good title was desired by Mr. Daskal, since Mr. Daskal told Mr. O'Dell that he intended to own

and enjoy the painting for a limited period of time and then he would like to resale it on the market.

70. Mr. Daskal reasonably relied on Live Art Market's false representation and bought "ya tena ase" from Live Art Market.

71. As a result of Live Art Market's misrepresentation, Mr. Daskal suffered damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant for damages in an amount to be proven at trial but in any event no less than $80,292.50, with interest thereon from November 18, 2021, together with an award of reasonable attorneys' fees and costs for prosecuting this action and such other and further relief as to this court may seem just and proper.

Dated: New York, New York
September 6, 2023

FOSTER GARVEY P.C.

By: *Yeli Zhou*
Alan A. Heller, Esq. (AAH-7942)
Yeli Zhou, Esq. (5661582)
100 Wall Street, 20th Floor
New York, New York 10005
(212) 431-8700
alan.heller@foster.com
yeli.zhou@foster.com