UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DW PROPERTIES,

                        Plaintiff,

        -v-

LIVE ART MARKET, INC.,

                        Defendant.

23-CV-7004 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Plaintiff DW Properties brings this action against Defendant Live Art Market, Inc. ("Live Art") based on a sale of a painting subject to certain resale restrictions. DW Properties asserts claims of breach of contract, breach of warranty, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation.

    Before the Court is Defendant's motion to dismiss the complaint for failure to state a claim. For the reasons that follow, the motion is granted in part and denied in part.

**I.    Background**

    **A.    Factual Background**

    The following facts are drawn from the allegations in the amended complaint, which are presumed true for the purpose of resolving Defendant's motion to dismiss. (*See* ECF No. 16 ("FAC").)

    Plaintiff DW Properties is a Belgian company whose principal, Sacha Daskal, is a collector of contemporary art. (*Id.* ¶¶ 4, 14-15.) Daskal has purchased approximately fifteen pieces of art from Defendant Live Art, which is a global art trading platform that helps conduct the discovery, sales, and distribution of art. (*Id.* ¶¶ 9, 17.) Daskal frequently sought advice and guidance about his art collection from Live Art. (*Id.* ¶ 17.)

On November 12, 2021, Live Art's Executive Vice President, George O'Dell, informed Daskal of the opportunity to purchase a painting by Cornelius Annor, titled "ya tena ase" (the "Painting"). (*Id.* ¶¶ 11, 18.) Daskal told Live Art that he intended to own the Painting for a limited period of time before reselling it on the market, and because of that intention, Daskal asked Live Art a series of questions about the Painting's marketing potential and estimated sales price. (*Id.* ¶¶ 20-21.) Live Art responded that he could likely resell the Painting on the market for $120,000. (*Id.* ¶ 22.) During the conversations between Daskal and Live Art, Live Art never mentioned anything about the fact that there was a resale restriction on the Painting. (*Id.* ¶ 23.) Instead, Live Art represented to Daskal, who does not have any special knowledge in contemporary art, that it would deliver good title without any resale restriction upon his payment of the purchase price. (*Id.* ¶¶ 24, 26.)

Daskal, acting as the Principal of DW Properties, purchased the Painting on November 18, 2021 for $80,000, which included a $5,000 commission for Live Art. (*Id.* ¶ 30.) The terms and conditions of the invoice state that "Seller warrants that good title to the Work shall pass upon payment of the Purchase Price and that the Work was created by the artist . . . ." (*Id.* ¶ 25; ECF No. 16-1 at 3.)

Over the coming months, Daskal inquired multiple times with Live Art about whether it would be a good time to sell the Painting. (FAC ¶¶ 31-33.) On February 13, 2023, O'Dell recommended that Daskal give three pieces of art in his collection, including the Painting, to the auction house Phillips to sell them as a package. (*Id.* ¶ 33.) Live Art assured Daskal that he would be able to break even or profit above his $80,000 purchase price, and Daskal agreed to proceed with the auction at Phillips. (*Id.* ¶ 34.)

On April 20, 2023, however, Phillips's Principal Auctioneer told Daskal that a third-party art studio had informed Phillips that it had sold the Painting to Live Art with a valid and enforceable resale restriction in the United States, and that Live Art had violated that resale restriction by selling the Painting to DW Properties. (*Id.* ¶ 36.) Specifically, the contract between Live Art and that studio, Good Lamp, states that "Buyer agrees it will not, under any circumstances offer [the Painting] through an art fair or public auction for a three (3) year period (the "Non-Resale Period") starting from the date of this invoice. [The Painting] is also sold on condition that, during the Non-Resale Period, [Live Art] will not offer [the Painting] for a private sale to a third party other than by offering GOOD LAMP a first right of refusal to carry out this sale." (*Id.* ¶ 41; ECF No. 16-2 at 1.) Earlier that month, the owner of Good Lamp had also e-mailed the Phillips auction team, explaining that the Painting "is restricted from going to auction until November 13, 2024, and that it is also subject to a right of first refusal which has not been given to my company Good Lamp." (FAC ¶ 42.) Live Art did not offer the Painting to Good Lamp pursuant to the right of first refusal before Live Art sold the Painting to DW Properties. (*Id.* ¶ 44.)

The Principal Auctioneer of Phillips told Daskal that due to the sale restriction on the Painting, the art studio might take legal action against Phillips and DW Properties. (*Id.* ¶ 37.) Phillips then exercised its right under an agreement to withdraw the painting from the auction. (*Id.* ¶ 38.) Daskal had never heard about any resale restriction, and had he learned about any such restriction, he would not have bought the Painting in the first place. (*Id.* ¶ 39.)

**B.     Procedural History**

On June 28, 2023, Plaintiff DW Properties commenced this action against Defendant Live Art Market, Inc. in the Supreme Court of New York, County of New York. (ECF No. 1

3

¶ 1.)  On August 9, 2023, Live Art filed a notice of removal to this Court.  (*See id.*)  On September 7, 2023, DW Properties filed an amended complaint, which is the operative complaint.  (ECF No. 16.)

On September 27, 2023, Live Art filed a motion to dismiss the complaint for failure to state a claim.  (ECF No. 19.)  DW Properties filed an opposition to the motion to dismiss on October 11, 2023 (ECF No. 22), and Live Art filed a reply in support of its motion on October 18, 2023 (ECF No. 23).

**II.      Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. Discussion

### A. Breach of Contract

"On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010). Here, both of the relevant written contracts are incorporated into, and attached to, the complaint. *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (on a motion to dismiss, a court can consider "documents appended to the complaint or incorporated in the complaint by reference"). The contract that is directly at issue is DW Properties' agreement (labeled an "Invoice") to purchase the Painting from Live Art. That agreement contains "TERMS AND CONDITIONS OF SALE," including the "warrant[y]" that "good title to the Work shall pass upon payment." (ECF No. 16-1 at 3.) The contract that is indirectly at issue is Live Art's earlier contract to buy the Painting from Good Lamp, and it is the latter contract that contains the restrictions on sale. Specifically, DW Properties contends that the two restrictions on sale of the Painting mean that Live Art did not convey "good title" to DW Properties, as required by the sales contract between itself and Live Art. (*See* ECF No. 16-1 at 3 ("Seller warrants that good title to the Work shall pass upon payment of the Purchase Price . . . .").) Because DW Properties has sufficiently alleged that Live Art sold the Painting in contravention of its contract with Good Lamp, which may have affected its ability to pass good title to DW Properties, Live Art's motion to dismiss the breach of contract claim is denied.

DW Properties bases its breach of contract argument on two restrictions contained in the sales contract between Good Lamp and Live Art. The first states that "Buyer agrees it will not, any under circumstances offer The Artwork through an art fair or public auction for a three (3) year period (the "Non-Resale Period") starting from the date of this invoice." (ECF No. 16-2 at 2.) The second provides: "The Artwork is also sold on condition that, during the Non-Resale

5

Period, The Buyer will not offer The Artwork for a private sale to a third party other than by offering GOOD LAMP a first right of refusal to carry out this sale." (*Id.*) DW Properties alleges that Live Art never informed it about either restriction, and that it violated the second restriction by failing to offer Good Lamp a right of first refusal before selling the Painting to DW Properties. (FAC ¶ 44.)

As an initial matter, and contrary to what both parties appear to assume, it is far from clear that the no-auction and right of first refusal requirements actually apply directly to Live Art. The contract between Live Art and Good Lamp states only that "Buyer [Live Art] agrees to include the following resale restrictions *when reselling* these artworks." (ECF No. 16-2 at 2 (emphasis added).) The contract then goes on to describe the two restrictions that Live Art is obligated to include in any future *resale* contract. The most natural reading of that contract language is that it requires Live Art to include those two restrictions in any contracts *with a future buyer*, and not necessarily that Live Art itself must comply with those restrictions. As a result, while DW Properties appears to understand the contract as requiring Live Art to have given Good Lamp a right of first refusal upon selling the work (*see* ECF No. 22 at 5 ("Live Art Market never offered [Good Lamp] a first right of refusal before it sold the painting to DW Properties. Therefore, the transfer of title from Live Art Market to DW Properties was flawed.")), the more natural reading is that Live Art was obligated to include these restrictions in any resale contract with, and thus bind, a subsequent buyer, like DW Properties.

Still, regardless of whether the restrictions apply to Live Art or are simply required to be included in contracts with future buyers, DW Properties has sufficiently alleged a breach of contract: In either scenario, Live Art's sale of the Painting to DW Properties failed to comply with the contract's requirements, potentially creating encumbrances on the Painting's title. If

6

Live Art was itself required to comply with the right of first refusal, DW Properties alleges that it failed to do so (FAC ¶ 44); if Live Art was required to include the two restrictions in its sales contract with DW Properties, it also failed to do so (*see* ECF No. 16-1 at 3).

To be clear, the sale restrictions imposed a contractual duty on Live Art to Good Lamp, not to DW Properties. Because DW Properties was not a party to that contract, it cannot sue Live Art directly on those restrictions. It is Live Art's failure to include those restrictions in reselling the Painting to DW Properties, or even to inform DW Properties about them, that could potentially make Live Art liable to DW Properties, and any such liability must be through the "good title" warranty given by Live Art to DW Properties.

The Second Circuit's decision in *Jeanneret v. Vichey*, 693 F.2d 259 (2d Cir. 1982), broadly supports DW Properties' position that an encumbrance that may undermine the resale value of a painting can constitute failure to deliver good title. *Jeanneret* involved an action by an artwork purchaser against the seller for having sold a painting that was allegedly illegally exported from Italy. *Id.* at 261. According to the plaintiff, the work's status as having been illegally exported from Italy rendered it more difficult to resell, and the plaintiff brought various claims, including a claim for breach of contract. *Id.* at 261, 268. After the defendants appealed a jury verdict against them, the Second Circuit determined that the jury instructions were erroneous because they failed to focus on whether the painting was more than fifty years old at the time of its exportation, which was the relevant fact that determined whether the painting was exported in violation of Italian law. *Id.* at 268. In remanding the case, the court suggested that if the painting had indeed been sold and exported in violation of that law, such violation could "create an encumbrance sufficient to invoke § 2-312(1)(b)," *id.* at 269, a provision of the N.Y. Uniform Commercial Code that requires all sales contracts to include a "warranty by the seller

7

that . . . the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge," N.Y. U.C.C. § 2-312(1)(b).*

Here, too, there is a question as to whether Live Art's failure to honor the terms of its contract with Good Lamp "create[s] an encumbrance sufficient to invoke § 2-312(1)(b)" and suggests that Live Art did not pass good title to DW Properties, in violation of the sales contract. *Jeanneret*, 693 F.2d at 269.  Works that have been sold without honoring certain contractual restrictions can result in litigation that functions as a cloud over good title.  *See, e.g.*, *Wildenstein & Co., Inc. v. Wallis*, 79 N.Y.2d 641, 646-67, 651 (1992) (addressing appeal from litigation that was initiated due to an art dealer's failure to honor a right of first refusal, and concluding that the right of first refusal at issue in that case was not prohibited by the rule against perpetuities or the common-law rule against unreasonable restraints on alienation); *Cipriano v. Glen Cove Lodge #1458, B.P.O.E.*, 297 A.D. 2d 649, 651 (2d Dep't 2002) (because property owner failed to honor right of first refusal in a sale, "closing on the property was delayed due to the cloud on the title created by [that] interest").  Thus, even if DW Properties is not a party to the contract between Live Art and Good Lamp, the failure of Live Art to sell the Painting in accordance with that contract may undermine the title that Live Art passed to DW Properties.

---

* Live Art also cites *MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458 (1st Dep't 2014), for the proposition that a contract for the sale of a good does not obligate a seller to ensure that the buyer can resell the product in the future.  (ECF No. 20 at 10-11.)  But *MAFG* involved a claim against the defendants based on their "ent[ry] into a subsequent agreement that decreased their incentive to be involved in resales of the sculpture, because without defendants' involvement, plaintiffs would not realize as high a price on the resale." *MAFG*, 123 A.D.3d at 459.  Here, DW Properties does not seek to hold Live Art liable for taking a subsequent action that indirectly affected the product's resale price, nor is DW Properties contending that Live Art has a continuing obligation to bolster that resale price.  Instead, DW Properties argues that Live Art's failure to sell the Painting in compliance with the terms of its contract with Good Lamp precluded it from conveying good title to DW Properties in the first place, as required by the contract between DW Properties and Live Art.

Indeed, DW Properties' allegations that Phillips declined to auction the Painting because of Live Art's failure to comply with the requirements of its contract with Good Lamp suggests that such failure may constitute a continuing encumbrance on the Painting. Borrowing from the real property context, "good title" is "one that is free and clear from incumbrances and encroachments," and DW Properties has alleged that Live Art's failure to comply with the contract may constitute an encumbrance. *Lovell v. Jimal Holding Corp.*, 127 A.D.2d 747, 749 (2d Dep't 1987) (internal quotation marks and citation omitted). Moreover, while Live Art argues that DW Properties cannot show any damages, the allegations suggest that Live Art's failure to comply with the contract resulted in DW Properties' being unable to sell the Painting through Phillips when it wished to do so. *Cf. Menzel v. List*, 24 N.Y.2d 91, 95-96, 97-98 (1969) (discussing various possible measures of damages "had title been as warranted by the" seller of a painting).

### B.   Breach of Warranty

Live Art contends that DW Properties' second claim, a breach of warranty claim, is duplicative of its breach of contract claim. But Courts have rejected the argument that a "warranty claim is impermissibly duplicative of [a] contract claim," because "although [plaintiff] cannot recover twice for the same injuries, New York law entitles a plaintiff to assert alternative theories of liability." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 301 (S.D.N.Y. 2023) (internal quotation marks and citation omitted); *see also Trodale Holdings, LLC v. Bristol Healthcare Invs., L.P.*, No. 16-CV-4254, 2017 WL 5905574, at *13 (S.D.N.Y. Nov. 19, 2017) ("The Court is unaware of any rule under New York law that breach-of-contract and breach-of-express-warranty claims cannot stand together, and courts in this District have permitted the two to proceed together.").

In this case, DW Properties contends that even if Live Art did not breach its sales contract, it is still liable to DW Properties because it made express warranties about passing good title and the lack of any restrictions on the Painting. (*See* FAC ¶¶ 21-24.) DW Properties is permitted to make such an argument in the alternative. Indeed, given that the breach of contract argument is itself based on an express "warrant[y]" of good title, there may not be any difference between the two claims, and the Court sees no reason to make the Plaintiff choose the title of its claim at this stage.

C.     **Breach of the Implied Covenant of Good Faith and Fair Dealing**

The Court does, however, grant Live Art's motion to dismiss DW Properties' third claim, which is based on the breach of the implied covenant of good faith and fair dealing, on the ground that it is duplicative of the breach of contract claim. A "claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Polcom USA, LLC v. Affiliated FM Ins. Co.*, 551 F. Supp. 3d 290, 297 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).

Here, DW Properties' breach of the implied covenant of good faith and fair dealing claim is based on the same facts that give rise to its breach of contract claim—the resale restrictions mentioned in the contract between Live Art and Good Lamp. And while DW Properties argues that the Court can consider this claim if it chooses to reject its breach of contract claim, such alternative claims are impermissible when they seek identical relief on identical facts. *See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 94 (S.D.N.Y. 2018) (dismissing claim of breach of implied covenant of good faith and fair dealing as duplicative of breach of contract claim where the damages sought on the former claim were

"identical to the damages they seek for the alleged breach of contract"); *see also Kitchen Winners*, 668 F. Supp. 3d at 288.

### D.     Negligent Misrepresentation

To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Live Art contends that DW Properties cannot show the first element of a special relationship between the two parties, as "[a]llegations of superior knowledge or expertise in the art field are per se insufficient to establish the existence of a fiduciary relationship." *Arthur Props., S.A. v. ABA Gallery, Inc.*, No. 11-CV-4409, 2011 WL 5910192, at *5 (S.D.N.Y. Nov. 28, 2011) (internal quotation marks and citation omitted).  The authorities Live Art cites, however, primarily involve scenarios in which a buyer enters a one-time, arms-length transaction with a seller. *See, e.g.*, *Ravenna v. Christie's Inc.*, 289 A.D.2d 15, 16 (1st Dep't 2001) ("The complaint describes a single meeting between plaintiff's wife and [the art dealer] during which plaintiff's wife showed him photographs of the painting in question.")

By contrast, courts have found the existence of a special relationship when there is an ongoing relationship of advice and reliance between two parties.  In *Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996), the New York Court of Appeals concluded that a special relationship existed when "Defendant's efforts sought to induce plaintiffs to invest in the project, and included

11

providing his accountant with projections," and when "Defendant also met with each plaintiff, personally represented that the project would generate some income and urged plaintiffs to review and rely on the projections." *Id.* at 257-58. In *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), the Second Circuit reversed a district court's decision to dismiss a negligent misrepresentation claim for lack of a special relationship, explaining that the plaintiff's complaint in that case had "implie[d] a relationship between the parties that extended beyond the typical arm's length business transaction." *Id.* at 103. Among other conduct, defendants "repeatedly vouched for the veracity of the allegedly deceptive information," "appeared to possess—and held themselves out as possessing—special knowledge," and "knew that plaintiffs sought information . . . to aid their investment decision and defendants supplied it for that purpose." *Id.* at 103-04.

As in *Kimmell* and *Suez*, there was more than just a "typical arm's length business transaction" here, suggesting the possibility of a special relationship. *Id.* at 103. Daskal purchased approximately fifteen artworks from Live Art over a period of time (FAC ¶ 17; ECF No. 22 at 11); Live Art was the one that approached Daskal about the opportunity to purchase the Painting (FAC ¶ 18); Live Art informed Daskal that the Painting "had the most upside potential for profit in the event of a resale" (*id.*); Live Art counseled Daskal about the marketing potential and estimated future sales prices of the Painting (*id.* ¶ 21); and Live Art "continuously attempted to communicate directly with Mr. Daskal to induce him to purchase the painting through WhatsApp messages and phone calls" (*id.* ¶ 23). "Given that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations are sufficient to overcome a motion to dismiss." *Suez*, 250 F.3d at 104.

The Court also disagrees with Live Art that DW Properties has not alleged the existence of a material misrepresentation.  While Live Art contends that the existence of enforceable restrictions on the resale of the work amount to simply "hearsay," DW Properties makes sufficient allegations to support the inference that Live Art negligently misrepresented that DW Properties would receive good title and that there existed no restrictions on Live Art's ability to sell the work.  (FAC ¶¶ 24, 27, 68.)  DW Properties has therefore alleged enough facts for its claim of negligent misrepresentation to survive a motion to dismiss.

### IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss the complaint is GRANTED IN PART and DENIED IN PART.

Defendant is directed to file an answer to the surviving claims in Plaintiff's complaint within 21 days after the date of this opinion and order.

The Clerk of Court is directed to close the motion at ECF Number 19.

SO ORDERED.

Dated: April 22, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge